IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 06-22020-CIV-MOORE/GARBER

PERRY ELLIS INTERNATIONAL, INC.,
PERRY ELLIS INT'L EUROPE, LTD.,

    Plaintiffs,

vs.

URI CORPORATION,

    Defendant.
_____/

## ORDER GRANTING IN PART PLAINTIFFS' AMENDED MOTION FOR DEFAULT FINAL JUDGMENT; ENTERING DEFAULT FINAL JUDGMENT

THIS CAUSE came before the Court upon Plaintiffs' Amended[1] Motion for Default Final Judgment (DE # 68). On July 31, 2007, the Court entered default (dkt # 64) against Defendant URI Corporation. Defendant has not filed a response to this motion.

UPON CONSIDERATION of the Motion, the supporting affidavit and declaration, the record, and being otherwise fully advised in the premises, the Court enters the following order.

### FINDINGS OF FACT

1.    Plaintiffs filed this action against Defendant seeking damages and injunctive relief under the Lanham Act, Florida law and common law regarding Defendant's violation of Plaintiffs' trademark rights as well as regarding Defendant's breach of its license agreement with Plaintiffs.

---

[1] Plaintiffs' original Motion for Default Judgment (dkt # 65) was denied without prejudice by this Court's September 5, 2007 Order (dkt # 67) because Plaintiffs based that motion on allegations in a proposed Second Amended Complaint, which this Court had not granted Plaintiffs leave to file. The Amended Motion for Default Judgment (dkt # 68) is based on allegations in the First Amended Complaint, which is the operative complaint in this action.

2. On July 31, 2007, this Court entered a default against Defendant as a sanction for failing to file its initial disclosures in compliance with the Court's Order dated July 22, 2007. In pleadings filed by Defendant's counsel seeking to withdraw, Defendant stated its willingness to accept a default judgment in this matter.

3. On September 7, 2007, Plaintiffs filed an amended motion for entry of default final judgment seeking the entry of a permanent injunction against Defendant; breach of contract damages for unpaid royalties due under the license agreement, statutory damages pursuant to 15 U.S.C. §1117(c) regarding Defendant's willful counterfeiting and trademark infringement; and an award of attorney's fees and costs.

4. The Court may enter this relief without holding an evidentiary hearing based upon affidavits and other documentary evidence if the facts are not disputed. Dunkin' Donuts Inc. v. Kashi Enter., Inc., 119 F.Supp.2d 1363 (N.D. Ga. 2000). By defaulting, Defendant has admitted Plaintiffs' well pleaded allegations of fact. Buchanan v. Bowman, 820 F.2d 359 (11th Cir. 1987); Pepsico, Inc. v. Distribuidora La Matagalpa, Inc., 2007 WL 1655436 (S.D. Fla. 2007).

5. Plaintiffs have set forth well pleaded allegations in its Amended Complaint establishing Defendant's willful infringement of Plaintiffs' trademarks and its willful violation of unfair competition under the Lanham Act through its selling of counterfeit goods bearing PEI's registered trademark. Plaintiffs have also set forth well pleaded allegations in the Amended Complaint regarding Defendant's breach of the License Agreement between the parties. Plaintiffs have filed the Declaration of Geri L. Mankoff, Esq. in connection with its motion and has previously submitted Declarations from Ms. Mankoff and Alberto Maduro in support of its motion for preliminary injunction.

6. Additionally, an evidentiary hearing was held on May 22, 2007 on Plaintiffs' Motion for a Preliminary Injunction before Magistrate Judge Garber. Magistrate Judge Garber made certain findings of fact and entered a preliminary injunction against Defendant. This Court adopted Magistrate Judge Garber's Report and Recommendation pursuant to Order dated July 6, 2007.

### The Plaintiffs' Trademark

7. Plaintiff, Perry Ellis International, Inc. is a recognized leader in the apparel business. Perry Ellis International, Inc., through its wholly owned subsidiary, Plaintiff, PEI Licensing, Inc., is the owner of trademarks which have been registered with the United States Patent and Trademark Office including, among others, the trade mark for "Perry Ellis America." (the "PEA trademark").

8. The Perry Ellis family of trademarks is well-known and highly recognized worldwide (the "PEI trademarks"). Perry Ellis' products bearing its family of trademarks are known and are famous for their excellent style, quality and workmanship throughout the world.

9. The PEA trademark is distinctive. As a result of its long-standing reputation for producing high quality products, Perry Ellis has developed substantial goodwill, making its family of trademarks synonymous with fine products around the world. Thus, the PEA trademark has become famous and one of the visible symbols for the brand and represents substantial value to Perry Ellis.

### The License Agreement

10. Plaintiffs, Perry Ellis International, Inc. and Perry Ellis International Europe, Ltd. (collectively "PEI" or "Plaintiffs"), as Licensor, entered into a License Agreement with Defendant URI Corporation ("URI"), as Licensee, with an effective date of January 4, 2006. (the "Agreement")

Under the terms of the Agreement between PEI and URI, URI was permitted to manufacture and distribute footwear using PEI's Perry Ellis America trademark in the territory of Mexico as PEI's exclusive licensee in exchange for complying with all of its obligations under the Agreement including requirements regarding manufacturing and distribution and the timely payment of all fees due under the Agreement.

11. Pursuant to Sections 2.4 and 9.2 of the Agreement, URI agreed that the authorized product bearing the PEA trademark ("Licensed Product") was to be sold in stores of high quality, reflecting the prestige of the PEA trademark. Further, URI agreed that the Licensed Product could only be distributed to those retailers listed on Exhibit "I" to the Agreement and to additional customers approved in writing by the PEI.

12. Pursuant to Section 11.1 of the Agreement, URI agreed and acknowledged that all product was to be manufactured in accordance with the high standards of quality of PEI and that all aspects of manufacturing, including fabrics, patterns, color direction, label, logos and packaging was required to be approved in writing in advance by PEI. All product was required to meet PEI's standards of design, quality and workmanship, in PEI's sole discretion.

13. The written approvals required by Section 11.1 were to be obtained by PEI prior to sale and manufacture of the product. Section 11.2 provided URI with a thirty (30) day cure period in the event its applications for pre-sale approval were rejected by PEI.

14. Pursuant to Section 10.1(a) of the Agreement, URI agreed that is was not permitted to authorize or purport to authorize any other party to use the PEA trademark.

15. Pursuant to Section 15.1(n) of the Agreement, PEI was permitted to immediately terminate the Agreement with no right to cure if URI manufactured, distributed or sold product

bearing the PEA trademark that had not been approved by PEI in writing or manufactured, distributed, sold or used the PEA trademark for Licensed Products in a manner not approved by PEI.

16. Additionally, pursuant to Section 15.1(p) of the Agreement, PEI was permitted to immediately terminate the Agreement with no right to cure if URI sold or distributed Licensed Product or product bearing the PEA trademark outside the authorized channels of distribution or if URI sold or distributed the product to a third party who sold the Licensed Product outside of the authorized channels of distribution.

### Defendant URI's Willful Infringement

17. In early May 2006, Alberto Maduro, Vice President of Licensing for Plaintiff Perry Ellis International, Inc. and its related subsidiaries and affiliates, traveled to Mexico. During his trip, two of PEI's other licensees independently complained to Mr. Maduro that PEI was allowing Perry Ellis America footwear to be sold in Tiendas Chedraui, a discount store in Mexico. The PEA trademark appeared on the box containing the shoes as well as on the shoes themselves.

18. Tiendas Chedraui was not an authorized channel of distribution under the Agreement. Tiendas Chedraui is known as a mass market or "big box" store in the industry. It is a store very similar to Walmart in the United States. The sale of PEA products in such a discount store causes damage to the image of the brand because higher end retail stores will refuse to sell identical goods being sold at a lower price by a discount store. It is Plaintiffs' policy not to permit the sale of PEA products in a discount store, except under limited circumstances with its approval.

19. After his discussion with the other PEI licensees, Mr. Maduro reviewed a newspaper advertisement confirming that Perry Ellis America footwear was being sold in Tiendas Chedraui.

20. On May 9, 2006, Mr. Maduro visited the Tiendas Chedraui and purchased a pair of

the offending footwear. The footwear appeared to be of inferior quality and was a style that, in addition to quality issues, would not have been approved by PEI. The subject footwear is an imitation or "knock-off" of the well known Converse All-Star sneaker. The subject footwear did not meet the image of design and quality required by PEI. The subject footwear was never approved in writing by PEI. URI knew that the subject goods bore unauthorized counterfeit marks, reproductions, copies and/or colorable imitations of the PEI trademarks or willfully ignored such fact.

21. Mr. Maduro returned to Miami, Florida, where PEI's headquarters are located, and provided the footwear and information regarding his trip to Geri Mankoff, Esq., in-house counsel for PEI. At or about that time, Ms. Mankoff was notified by U.S. Customs that 500 cartons of similar sneakers bearing the PEA trademark were seized by U.S. Customs under suspicion that they were counterfeit.

22. A sticker in the sneaker indicated that: Geoffery Allen Corporation was the exporter, Del Mo Corp was the importer and a factory in Malaysia named Golden Anchor was the manufacturer of the sneaker. Ms. Mankoff sent cease and desist letters to these entities on May 16, 2006.

23. GAC immediately responded to PEI and denied liability. GAC indicated that it would conduct an investigation regarding the matter. Ultimately, GAC provided PEI with written evidence that it did not manufacture or sell the subject footwear.

24. In a conversation with a representative of Del Mo, Ms. Mankoff was informed that Ramirez Sport imported the shoes. Ramirez Sport is a company which was used by Defendant URI to manufacture and import product. On June 9, 2006, PEI sent a cease and desist letter to Ramirez Sport.

25. On June 14, 2006, Mr. Maduro spoke by telephone with Song Jun Lee, President of Defendant URI. Mr. Maduro confronted Mr. Lee with the information that he had obtained in Mexico. Mr. Lee told Mr. Maduro that he was very sorry and immediately acknowledged that URI was selling product bearing the PEA trademark which was unauthorized and had not been approved in writing in advance as required by the Agreement. Mr. Lee also admitted that URI was selling this unauthorized PEA product outside the authorized channels of distribution under the Agreement, including selling them at the Tiendas Chedraui. Mr. Lee also admitted that subject footwear URI was selling through the unauthorized retailers did not conform to the standard of products manufactured under the PEA trademark.

26. At the end of the telephone conversation, Mr. Lee requested an appointment to meet with PEI's chairman of the board, George Feldenkreis, the next day. Mr. Maduro told Mr. Lee that he could not guarantee him an appointment on such short notice and advised Mr. Lee not to travel to Miami without a confirmed appointment.

27. Despite this conversation, the very next day, on June 15, 2006, Mr. Lee, along with Brian Min, Chief Financial Officer of URI, flew to Miami and appeared at Plaintiffs' offices. Mr. Lee and Mr. Min did not meet with Mr. Feldenkreis. Mr. Maduro had a conversation where once again Mr. Lee admitted URI had manufactured the unauthorized product being sold at Tiendas Chedraui and that the product had not been approved in writing in advance by PEI as required by the Agreement. Mr. Lee also admitted the footwear URI was selling through the unauthorized retailers did not conform to the standard of products manufactured under the PEA trademark. Mr. Lee apologized and begged for a second chance for URI. Mr. Maduro indicated to Mr. Lee that the matter was being handled by PEI's legal department.

28. On June 19, 2006, Ms. Mankoff, on behalf of PEI, sent URI a letter terminating the Agreement. In the letter PEI demanded that URI 1) cease distributing authorized and unauthorized PEA product; 2) remove unauthorized PEA shoes from all retailers; 3) provide detailed inventory list of unauthorized and authorized product; 4) maintain books and records regarding authorized and unauthorized product; 5) provide affidavit of entities to whom unauthorized product was sold; 6) provide detail accounting of profit from unauthorized product and 7) pay PEI profits from unauthorized sales.

29. On June 21, 2006, Mr. Lee sent an e-mail to Mr. Feldenkreis attaching a letter (incorrectly dated June 23, 2006). In the e-mailed letter, Mr. Lee, on URI's behalf, admitted that the unauthorized product sold "was once submitted for approval but eventually did not get approved."

30. Subsequently, on numerous occasions via e-mail, Ms. Mankoff requested that URI provide her with items requested in her June 19, 2006 demand letter including documentation regarding URI's sales and profits from the sale of the unauthorized product and requested that URI make its books and records available for audit as required by Section 8.2 of the Agreement.

31. Section 8.2 of the Agreement provides that PEI may, for a period of up to three (3) years after termination of the Agreement, inspect URI's books and records regarding sale of PEI product upon five (5) business days notice.

32. In response to Ms. Mankoff's requests for an audit, Mr. Hong agreed to provide the audit but continually delayed in providing a date for the audit to occur.

33. On July 14, 2006, Mr. Hong sent an e-mail to Ms. Mankoff enclosing 2 affidavits signed by Lee. In one of the Affidavits, Mr. Lee admitted that URI sold "unauthorized Perry Ellis America footwear" to two distributors and provided contact information for the two distributors.

34. In the e-mail, Mr. Hong indicated that URI was "not in a position to take back the shoes from the retailers" because the product was not in URI's in control after sale to the two wholesalers. In the e-mail, Mr. Hong stated that requested accounting would be provided "soon." Thereafter, URI continued to delay in providing a date for the requested audit.

35. On August 10, 2006, PEI filed the instant lawsuit. Thereafter, URI advised PEI that it would not provide an audit and that the audit would have to be obtained in the instant lawsuit.

36. Geri Mankoff received URI's response to her letter dated June 19, 2006 in a letter dated August 11, 2006 from Sebong Hong, counsel for URI. In the letter, URI refused to provide PEI with access to its books and records to complete a detailed accounting until after September 15, 2006.

37. URI did include a one page document in the August 11, 2006 letter purporting to be a schedule of its profits from the unauthorized PEI goods it sold. (Exhibit "A" to Ms. Mankoff's Declaration). This schedule indicated that URI sold 80,494 pairs of the offending shoes for a gross profit of $324,295.98 and a net profit of $228,400.78. URI further claimed that a purported refund to a customer reduced this profit.

38. To date, Perry Ellis has not been provided access to the requested books and records requested in my June 19, 2006 letter. As a result, Perry Ellis has been unable to verify the accuracy or veracity of the figures in the schedule provided by URI on August 11, 2006. Further, Perry Ellis has been unable to verify the expenses claimed by URI in the schedule or the purported customer refund.

39. Perry Ellis has not received any additional payments from URI since the August 11, 2006 letter was received.

40.     PEI has not received the documents reflecting all of URI's inventory of unauthorized product nor has it received the documents reflecting URI's sales and profits regarding the unauthorized goods. URI has refused to provide this information and refused to provide the audit, PEI cannot confirm that URI's sales of unauthorized products have ceased.

41.     If an injunction is not entered preventing URI from unauthorized use of the PEA trademark, PEI will lose its ability to control the nature and quality of the goods provided under its mark. There is no other adequate remedy to halt URI's sale of product bearing the PEA trademark to unauthorized retailers and to halt URI's sale of product bearing the PEA trademark which is not authorized. URI's sale of unauthorized product and sale to of PEA product to unauthorized retailers will damage PEI's goodwill and reputation.

## CONCLUSIONS OF LAW

As set forth herein, based upon the foregoing findings of fact, the Court finds that Plaintiffs are entitled to permanent injunctive relief as well as statutory damages, attorneys' fees and costs.

### A. Permanent Injunction

To establish entitlement to entry of a permanent injunction, Plaintiffs must show: 1) that it has prevailed in establishing the right asserted in the Complaint; 2) that there is no adequate remedy at law for the violation of the right; and 3) irreparable harm will result if the court does not enter the injunction. Alabama v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1128 (11th Cir. 2005); MPS IP Services Corp. v. Modis Comm., Inc., 2007 WL 723841 (M.D. Fla. 2007). To establish trademark infringement and unfair competition, Plaintiffs must establish two elements: 1) that Defendant used the subject marks in commerce without authorization and 2) that the unauthorized use is likely to deceive, cause confusion or result in mistake. MPS IP Services, 2007 WL 723841 at *1 *citing*

McDonald's Corp. v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1998).

Plaintiffs have established the Defendant's trademark infringement. Defendant used the PEA trademark in interstate commerce on the shoes it sold and on the box containing the shoes, when it sold the shoes at unauthorized retailers, including at Tiendas Chedraui. The shoes did not conform to the standard of products manufactured under the PEA trademark. Further, the product being sold at these unauthorized retailers was unauthorized product and did not conform with the standard of product to be manufactured under the Agreement and its various stages of manufacture had not been approved by the PEI Licensors.

Defendant's unauthorized use of the counterfeit products bearing the PEA trademark dilutes, misappropriates and unfairly competes with PEI's strong, famous and federally-registered PEA trademark in a manner that is likely to cause confusion, mistake, and deception among consumers, and to dilute the distinctive qualities of the PEA trademark.

Defendant's actions were willful. PEI's allegation that URI intentionally, knowingly, and willfully infringed upon PEI's trademarks has been established by the default. URI also admitted to PEI on several occasions that it had willfully violated PEI's rights and also provided PEI with an affidavit admitting its infringing activities. Further, willfulness may be inferred from the Defendant's willingness to accept a default judgment. MPS IP Services, 2007 WL 723841 at *3 citing Petmed Express, Inc. v. MedPets.Com, Inc., 336 F.Supp.2d 1213, 1220 (S.D. Fla. 2004).[2]

---

[2]The Court also notes that URI appears to have intentionally delayed the prosecution of this matter and in doing so, caused PEI to incur undue expense in contesting issues without a colorable factual basis for defense. URI first obtained a delay of many months and great expense by contesting jurisdiction in this Court, despite a provision in its contract with Plaintiffs consenting to jurisdiction in Florida. Then, URI refused to agree to a preliminary injunction despite the signed affidavit from its President, Song Jun Lee, which it provided to Plaintiffs prior to this lawsuit being filed admitting that it had infringed upon Plaintiffs' trademark. When a hearing was set regarding Plaintiffs' emergency motion for preliminary injunction, URI

By virtue of URI's trademark infringement, Plaintiffs have also established irreparable harm and no adequate remedy at law. It is usually recognized in trademark infringement cases that there is no adequate remedy at law to redress infringement and infringement by its nature causes irreparable harm. <u>Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.</u>, 51 F.3d 982 (11th Cir. 1995); <u>Gen. Motors Corp. v. Pat Cat Carts, Inc.</u>, 2006 WL 2982869 (M.D. Fla. 2006). <u>See</u> also, <u>PepsiCo</u>, *supra* (because trademark rights were infringed, the plaintiff would undeniably be prejudiced absent the entry of permanent injunctive relief; otherwise the defendant could continue to sell the offending product and confuse consumers).

Even if irreparable harm were not presumed, PEI has established irreparable harm. Without the entry of an injunction preventing URI from unauthorized use of the PEA trademark, PEI will lose its ability to control the nature and quality of the goods provided under its mark. There is no other adequate remedy to halt URI's sale of product bearing the PEA trademark to unauthorized retailers and to halt URI's sale of product bearing the PEA trademark which is not authorized. URI's sale of unauthorized product and sale of PEA product to unauthorized retailers will damage PEI's goodwill and reputation. <u>See</u>, <u>Gen Motors</u>, 2006 WL 2982869 at 8.

### B. Breach of the License Agreement

Based upon URI's actions set forth in detail in the findings of fact, URI breached the following Sections of the Agreement: Sections 11.1 and 11.2 (regarding the standard of quality of the subject goods); Sections 2.4 and 9.2 (regarding the authorized channels of distribution); and

---

did not send any witnesses or representatives other than counsel to attend the hearing. After the Court entered a preliminary injunction, 11 months after the lawsuit was filed, URI suddenly announced its willingness to accept a default judgment, indicating that its delaying tactics were a bad faith ploy to avoid payment of its obligations to PEI.

Section 10.1(a) of the Agreement (URI not permitted to authorize any other party to use the PEA trademarks).

Pursuant to Section 15.1(n) and Section 15.1(p) of the Agreement, PEI properly terminated URI pursuant to Ms. Mankoff's letter dated June 19, 2006. In accordance with these sections, PEI was immediately entitled to payment of the total Guaranteed Minimum Annual Royalty and the total Guaranteed Minimum Annual Advertising Royalty due pursuant to Section 15.9 of the Agreement. Based upon the detailed calculation set forth in Ms. Mankoff's Declaration, the Court finds the amount of damages owed by URI to PEI regarding the royalties is $501,000. This amount provides a credit for $69,000 previously paid by URI in January 2006.

PEI is entitled to an award of prejudgment interest regarding this liquidated sum of damages at the Florida statutory rate pursuant to Fla. Stat. §55.03. Maytronics, Ltd. v. Aqua Vac. Sys., Inc., 277 F.3d 1317 (11th Cir. 2002) (damages became liquidated on date of contract termination thus entitling plaintiff to prejudgment interest). The interest due for the time period June 19, 2006 to August 30, 2007 is $60,627.93.[3] The Court therefore awards PEI **$561,627,93** in damages for unpaid royalties under the License Agreement.

### C. Statutory Damages

The Court awards Plaintiffs statutory damages pursuant to 15 U.S.C. §1117(c). In crafting the statutory damages provision, Congress took into account that the infringing party's records are often nonexistent, inadequate or deceptively kept in order to willfully deflate the level of counterfeiting making proving actual damages extremely difficult, if not impossible. Kenneth Jay

---

[3] The per diem interest at the statutory rate for 2006 is $123.53 per day. 195 days x $123.53 = $24,088.35. For 2007, the per diem interest was $150.99. 242 days x $150.99 = $36,539.58. The total amount of interest is therefore 60,627.93.

Lane, Inc. v. Heavenly Apparel, Inc., 2006 WL 728407 (S.D.N.Y. 2006). In the instant case, despite repeated demand, and the right to audit URI's books and records under the terms of the License Agreement, PEI was not provided with access to URI's books and records thus making actual damages regarding URI' counterfeiting extremely difficult to prove.

A plaintiff may elect an award of statutory damages with respect to a violation that consists of the use of a counterfeit mark. A counterfeit mark refers to a counterfeit of a mark that is registered with the USPTO. Petmed, 336 F. Supp. 2d at 1220. In this case, Plaintiffs have demonstrated Defendant's trademark infringement and therefore have demonstrated Defendant's use of a counterfeit mark. Id.

If the use of a counterfeit mark was willful, then the statute allows an award of not more than $1,000,000 per counterfeit mark. 15 U.S.C. §1117(c)(2). See also, Petmed, 336 F. Supp. 2d at 1220. Statutory damages are intended not just for compensation for losses, but also to deter wrongful conduct. Id. at 1221. The court has broad discretion in setting the amount of statutory damages. Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d 161 (S.D. N.Y. 1999). See also, Microsoft Corp. v. Gordon, 2007 WL 154216 (N.D. Ga. 2007).

As set forth previously above, Defendant's actions were willful. URI intentionally, knowingly, and willfully infringed upon PEI's trademarks. URI also admitted to PEI on several occasions that it had willfully violated PEI's rights and also provided PEI with an affidavit admitting its infringing activities. Further, willfulness may be inferred from the Defendant's willingness to accept a default judgment. MPS IP Services, 2007 WL 723841 at *3.

Additionally, URI exhibited a callous disregard to PEI's rights. URI delayed this litigation in what appears to be a bad faith strategy designed to avoid payment to PEI. Further, although URI

14

admitted to selling at least 80,494 units of offending products, a significant amount, it refused to provide its books and records to PEI without justification thus bringing the accuracy of URI's statement of the amount of units sold into question. Based upon URI's bad faith tactics and its willful behavior, as well as the significant amount of offending goods URI sold, the Court deems it appropriate in its discretion to award PEI the maximum amount of $1,000,000.00 in statutory damages for use of the counterfeit mark on the subject shoes.[4]

Plaintiffs also request $1,000,000.00 in statutory damages for Defendant's use of the counterfeit mark on the boxes containing the shoes in addition to the $1,000,000.00 for the use of the counterfeit mark on the shoes themselves. However, 15 U.S.C. §1117(c) provides that statutory damages are an option to be had "instead of actual damages and profits under subsection (a)" and further provides that statutory damages may be granted "per counterfeit mark per type of goods or services." 15 U.S.C. §1117(c). In this case, Plaintiffs do not allege that Defendant had separate profits from the sale of the shoe boxes as a distinct good; rather, the shoes were sold with the shoe boxes as a single good and the profits received were not distinguishable between the boxes and the shoes. It would not be appropriate in this case to substitute statutory damages for profits obtained by the sale of the shoes and then impose additional statutory damages as substitute for the profits obtained by the sale of the boxes, when the profits were the same and the shoes and shoe boxes were not treated as separate goods. Plaintiffs do not allege that statutory damages should be had for the use of two distinct counterfeit marks.

---

[4] The Court may award breach of contract damages for past due royalties pursuant to an acceleration provision in the License Agreement as well as statutory damages pursuant to 15. U.S.C. §1117(c) to compensate Plaintiffs for Defendant's trademark infringement and unfair competition. See e.g., Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc., 2006 WL 728407 (S.D.N.Y. 2006) (awarding both accelerated royalties due under a license agreement as well as statutory damages).

### D. Attorneys' Fees and Costs

Pursuant to 15 U.S.C. §1117(a), a plaintiff is entitled to attorneys' fees in exceptional cases. An exceptional case is one where the conduct complained of can be characterized as willful and deliberate. MPS IP Services, 2007 WL 723841 at 1. In light of Defendant's willful conduct as set forth herein, Plaintiffs are entitled to recover their attorneys' fees. Id. As set forth in the Affidavit of Adam J. Lamb, Esq., Plaintiffs' counsel, Plaintiffs have expended $45,602.50 in attorneys' fees in this matter. The Court finds these fees to be reasonable and awards said amount to Plaintiffs.

Plaintiffs are also entitled to recover its taxable costs as the prevailing party pursuant to Rule 54. As set forth in the Affidavit of Adam J. Lamb, Esq., Plaintiffs incurred $1,298.10 in costs in this matter. The Court therefore awards Plaintiffs attorneys' fees and costs in this matter in the total amount of $46,900.60.

Based upon the foregoing, it is:

ORDERED AND ADJUDGED that Plaintiffs' Amended Motion for Default Final Judgment (DE # 68) is GRANTED IN PART as follows:

(1)     Defendant URI, its agents, employees, related companies, successors and assigns, and all persons acting in concert, participation or combination are permanently enjoined from:

> (a) using PEI's trademarks, including but not limited to the PEA trademark, in any manner whatsoever, and from using any mark or name confusingly similar thereto or using any colorable imitation of the PEI trademarks;

> (b) manufacturing, distributing, selling or offering for sale any product bearing PEI's trademarks, including but not limited to, the PEA trademark, itself or through a third party;

or manufacturing, distributing, selling or offering for sale any product using any mark or name confusingly similar thereto or any colorable imitation of the PEI trademarks;

(c) Manufacturing, distributing, selling or offering for sale the unauthorized PEA footwear which is the subject of this lawsuit.

(2) This permanent injunction is binding upon Defendant URI, its agents, officers, directors, partners, shareholders, servants, employees, attorneys, representatives, successors and assigns, and all other persons and entities in active concert or participation with them.

(3) Defendant shall recall from any and all channels of distribution all products incorporating PEI's trademarks, including but not limited to, the PEA trademark, or any colorable imitation of the PEI trademarks which is likely to cause confusion, mistake or deception or dilute or impair the distinctive quality of the PEI trademarks, alone or in combination with other words or symbols, including corrective advertising;

(4) The Court awards Plaintiffs damages for URI's breach of the License Agreement for unpaid royalties in the amount of $501,000 in addition to prejudgment interest at the statutory rate from June 19, 2006 through August 30, 2007 in the amount of $60,627.93 for a total award of $561,627,93 regarding this claim;

(5) The Court awards Plaintiffs $1,000,000 in statutory damages pursuant to 15 U.S.C. §1117(c) and Plaintiffs shall recover said amount from Defendant;

(6) The Court finds that this is an exceptional case and awards Plaintiffs their reasonable attorneys' fees in the amount of $45,602.50 pursuant to 15 U.S.C. §1117(a). The Court also awards

Plaintiffs $1,298.10 in costs as the prevailing party for a total of $46,900.60 in attorneys' fees and costs;

(7)     Execution shall issue forthwith on all sums due under this Final Judgment;

(8)     The Court retains jurisdiction to enforce this Final Judgment and the permanent injunction.

DONE AND ORDERED in Chambers at Miami, Florida, this 17th day of October, 2007.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:     All Counsel of Record